IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

TODD ELLIOTT KOGER           )
                             )
            Plaintiff,       )    Civil Action No. 10-1466
                             )
      v.                     )
                             )
                             )
ALLEGHENY INTERMEDIATE       )
UNIT, et al                  )
                             )
            Defendants.      )

## MEMORANDUM

Gary L. Lancaster,
Chief Judge.                              February 24, 2012

This is an employment discrimination action. Plaintiff Todd Elliott Koger,[1] proceeding pro se, alleges violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 1981 and 1983, and the Lilly Ledbetter Fair Pay Act, as well as related state law claims. Koger alleges that defendants terminated him from his teaching position at Duquesne City School District on the basis of his race. Koger seeks front pay, back pay, future wages, compensatory and punitive damages, and attorneys' fees, should an attorney be hired or

---

[1] Mr. Koger is no stranger to this court. By our count, this is the twelfth pro se lawsuit he has filed in this court over the years, against various and diverse defendants, usually alleging some affront to his civil rights. With the exception of one case, which appears to have settled, each has been dismissed for lack of merit, which dismissals were affirmed on appeal. In addition, he has been a frequent litigant in the Pennsylvania state courts.

appointed. Defendants argue that Koger was not properly certified to be a full-time teacher and that they did not allow him to continue as a substitute teacher due to his deficient performance.

Koger has named as defendants: (1) the Allegheny Intermediate Unit ("AIU"); (2) the Duquesne City School District (the "School District"); (3) the Duquesne City Educational Association (the "DCEA"); (4) the Pennsylvania State Educational Association (the "PSEA"); (5) Daniel Carey, a PSEA employee; (6) Stanley Whiteman, an employee of the School District and the President of the DCEA; (7) Barbara McDonnell, an employee of the School District; and (8) Mary Beth Colvill, an AIU employee. Koger has moved for summary judgment. [Doc. No. 70]. In response, the DCEA, PSEA, Carey, and Whiteman collectively [Doc. No. 76], and AIU, the School District, Colvill, and McDonnell collectively [Doc. No. 80] have filed motions for summary judgment. Koger has also filed two motions for sanctions, [Docs. 84 and 90], and a motion to strike undisclosed witnesses, [Doc. No. 83]. Defendants have jointly moved to strike several of Koger's responses. [Doc. No. 94].

For the reasons detailed below, defendants' motions for summary judgment will be granted, and Koger's motions will be denied. Defendants' motions to strike will be denied as moot.

2

I.    BACKGROUND

A.    AIU and Smart START Program

Smart START is the name of a regional educational program organized by AIU. AIU is a state-created agency that provides resources and services to 42 school districts in Allegheny County. Its relationship with the School District at the time these events occurred was governed by an Intergovernmental Agreement (the "IGA") dated July 16, 2007. The IGA provided that AIU would "provide various administrative and management services to Duquesne" to help it "continue to operate and educate its elementary students[.]" It also provided that: "The employees or agents of the parties who are engaged in the performance of this Agreement shall continue to be employees or agents of that party and shall not be considered for any purpose to be employees or agents of the other parties."

Smart START was developed in 2001 to deal with what AIU describes as a "documented nationwide shortage of substitute teachers," though it operates exclusively within Allegheny County. It provides training which allows participants with bachelor's degrees to obtain temporary teaching permits in order to work as substitute teachers in the public school system. Defendant Mary Beth Colvill, whose official title was Human

3

Resources Specialist IV, was the AIU employee in charge of coordinating the Smart START program.

To make the program work, AIU would apply to the Pennsylvania Department of Education ("PDE"), on behalf of the Smart START participants, for a special permit to teach, called an Emergency Permit. An Emergency Permit may not be used by a person who is certificated in the subject area being requested. 22 Pa. Code § 49.31; Penn. Dep't of Educ., Certificate & Staffing Policy Guideline (hereinafter "CSPG") No. 13, 8 (2010). There are two types of Emergency Permits: a Type 04 Permit, which allows the individual to work as a "long term substitute," that is, for over twenty consecutive days in a single assignment, and a Type 06, which allows the individual to work as a "day-to-day substitute" for fewer than 20 consecutive days. CSPG No. 13, 4-5 (2010).[2] Each automatically expires after the end of the summer school term. 22 Pa. Code § 49.33.

The Emergency Permit system is an exception to the requirement that all teachers in the public schools of the Commonwealth be properly certificated. 22 Pa. Code § 49.31. Under the default standard, teachers must hold an Instructional Certificate, of which there are two types. An Instructional I certificate requires a baccalaureate degree, completion of a

---

[2]    After a 2010 revision, the cutoff is now 20 cumulative days, rather than consecutive. Penn. Dep't of Educ., Certificate & Staffing Policy Guideline, No. 13, 9 (2010).

4

PDE-approved teacher preparation program, a qualifying score on an assessment examination, and certification from a college or university. 22 Pa. Code § 49.82. The Instructional II certificate requires several years' experience and additional credit hours of collegiate-level study. 22 Pa. Code § 49.83.

After completing Smart START training, applicants are asked to choose from among the participating school districts. If there is a match, AIU forwards the applicant's files and Emergency Permit to the school district. The school district itself interviews the applicant and makes the decision whether to employ the applicant as a day-to-day substitute.

B. Collective Bargaining Agreement

At the time of the allegations, the School District was subject to a collective bargaining agreement with the DCEA, with a term lasting from June 30, 2005 through June 30, 2009 (the "CBA"). The CBA recognized the DCEA as the bargaining agent for "the professional employees . . . and for the employees properly included in the bargaining unit as certified by the Pennsylvania Labor Relations Board . . . . The District recognizes that long-term (permanent) substitutes are included in the bargaining unit. Long-term substitutes are defined as employees who are hired for or are reasonably expected to be employed for a semester or more in a single position." The PSEA

5

is the state-wide affiliate for the DCEA and other local teachers' associations; it was not a party to the CBA.

Separately, the CBA recognizes three categories of substitute teachers: day-to-day substitutes, full-time utility teachers, and long-term substitutes. By definition, long-term Substitutes work in a specific assignment expected to last more than sixty days.[3] Day-to-day substitute teachers are called into school, as needed, to cover an absent teacher for a period lasting between one and sixty days. Full-time utility teachers report to school each school day and are assigned as needed. If a day-to-day substitute works in the same assignment for more than sixty days, he or she is to be recognized as a long-term substitute, receive the accompanying pay raise, and be retroactively compensated as a long-term substitute.

The CBA does not define "assignment." However, administrative guidance issued by the PDE as to Emergency Permits, which is part of the record before the court, defines an assignment as a person "teaching in the same public school

---

[3]    The definition of long-term substitute in the CBA, which requires sixty consecutive days in a single assignment, is different than that under the PDE regulations, which requires more than twenty consecutive days. It is thus possible for a teacher to require a Type 06 (long-term substitute) Permit and yet still qualify as a day-to-day substitute for purposes of the CBA. It appears that Koger could have been eligible for a Type 06 Permit had the School District or AIU sought his services for 2008-2009.

6

entity for the same individual in the same subject area." CSPG No. 13, 8 (2010).

## C. Koger's Employment

In August 2007, Todd Koger participated in training for Smart START. Koger, an African-American, held the bachelor's degree required by the Smart START program, but no further training relevant to elementary or middle school education. At the time, the Smart START program was only available in the Sto-Rox, East Allegheny, and Moon Area School Districts. According to defendants, in October of that year, the School District made it known that they needed substitutes and would like to participate in the Smart START program. When Colvill contacted the August 2007 trainees about teaching in the School District, Koger expressed interest. AIU then forwarded his application to the School District.

Koger began work at the School District on November 5, 2007. His Emergency Permit, Type 06, was issued on November 16, 2007. Defendants have produced a letter, dated November 28, 2007 (the "Hire Letter"), which confirms his appointment by the Board of Control of the Duquesne City School District, retroactive to November 5, "to the position of Day-to-Day Substitute." Although it is properly addressed to his home, Koger testified in deposition that he did not receive the Hire Letter.

Instead, he states that after being admitted to the Smart START program, he accepted an oral offer from Colvill to become a full-time utility teacher, as defined by the CBA. The oral agreement, he contends, was memorialized when he signed a copy of the CBA. As part of the oral contract, he was formally removed him from the Smart START program and put on a "fast track" where, after three years, he would be certified to teach.

At times in his pleadings, Koger insists that he is fully certified to teach, or at least to fill the position of utility teacher. In the alternative, he claims that the defendants intentionally procured the incorrect certification for him. He has not, to date, produced any proof of certification beyond the emergency permit.

D.   2007-2008 School Year

Koger was paid at a rate of $75.00 per day, consistent with the School District's pay rate for day-to-day substitutes. Had he been a full-time teacher, his salary would have been $33,911, which is the salary earned that year by Nannette Nowak and Jennifer Kovar, the full-time utility teachers on staff for the 2007-2008 school year, and Eric Robertson, who was hired as a utility teacher for 2008-2009.[4]   Beginning November 5, Koger

---

[4]     The parties dispute whether Robertson was on staff for the 2007-2008 school year. The ambiguity is resolved in favor of Koger for purposes of this motion.

8

worked 127.5 days[5] until the end of the school year. He initially taught at the elementary school until November 9th. He was then placed in seventh and eighth grade science, where he worked from November 14th through December 17th. At that time, a permanent science teacher, Gary Sandy, was hired. The record demonstrates that Koger spent the remainder of the year splitting time between two classrooms – Sandy's science room, and Blaze Balta's seventh grade reading room. The record contains the attendance records for both Sandy and Balta. Both missed substantial time and resigned prior to years' end. However, the longest consecutive period either was absent was the approximately 35 day period between Balta's resignation in April and the end of the school year. In deposition, Koger testified that, rather than remain in one classroom for a sustained period of time, the school was frequently "pulling [him] from the science room to cover another classroom." When asked if he ever covered a single assignment for sixty days, he responded:

> A: Based on those documents, I worked more than 60 consecutive days.
> Q: In a single assignment?
> A: Science or reading. Either one you want to take.
> Q: So your understanding is that if you worked 60 school days and you were in any classroom,

---

[5] Koger stated in his deposition and pleadings that the number was 129 days, but his time sheets, which are part of the record, demonstrate that 127.5 days is accurate.

9

> that is what you consider a single assignment?
> A: No. I was hired as a utility teacher. The
> contract says that utility teachers are to report
> every day. My title was utility teacher. As a –
> Q: When –
> A: Let me speak.
> Q: I am. Thank you.
> A: As a utility teacher, I worked 60 days.

Koger's performance as a substitute apparently left much to be desired. Barbara McDonnell, the principal at the time, described him as "habitually late." The parties dispute what time Koger was required to report to work,[6] but he does not deny that he allowed students from other classes to remain in his classroom, that he showed movies without permission, or that he gave the students free time during class periods.

In addition, the parties refer obliquely in many of their briefs to something called the "cupcake incident." From McDonnell's affidavit and the portions of Koger's deposition available on the record, it appears that a student brought cupcakes to class to share for her birthday. McDonnell witnessed the students eating in the classroom, a violation of school rules. Koger asserts, without substantiating evidence, that McDonnell conspired with the student's mother to frame him.

Throughout this period, Koger also claims to have witnessed inappropriate conduct toward students by several

---

[6] According to Koger, he did not need to be at work until 8:25 a.m., and testified that he arrived at 8:15 every day. McDonnell claims the proper time was 8:00, and that she expressed this to him in their March 26 meeting.

10

teachers, and that he complained about this conduct to McDonnell on multiple occasions. In March, he documented his complaints about pay, the inappropriate conduct, and the hostile environment created by McDonnell in a letter to William Addy, who at the time was the AIU Director of Human Resources.

On March 26, 2008, McDonnell met with Koger. The parties dispute the reason for this meeting. McDonnell claims that it was to discuss his performance issues. She claims they discussed his tardiness, the "cupcake incident," his failure to follow an instructor-prepared syllabus, his allowing students to watch movies during class hours, and his permitting students who were not in his class to visit and remain in his classroom. In contrast, Koger testified that the meeting only covered his use of outdated forms to discipline unruly students, his teaching methods, and the "cupcake incident." Koger was not disciplined at this meeting.

On the same day as his meeting with McDonnell, Koger approached Daniel Carey, Regional Field Director of the PSEA, and informed him that he was being paid as a day-to-day substitute but believed he should be classified as a long-term substitute. Carey and Koger located the Hire Letter in the School District office, and Carey informed him that the letter merely qualified him as the former. Carey further told him that the Smart START program could not allow him to attain a full-

time position without his first obtaining a Pennsylvania Instructional Certificate. Koger requested that the PSEA file a grievance on his behalf. According to Koger, Carey told him they would not do so because "they wanted to protect Nowak and they didn't want to make the District upset . . . they didn't want to make waves[.]" Carey denies making this statement.

The next day, he composed a hand-written complaint addressed to Colvill and another AIU official. In it, he asserted that McDonnell, the School District, and AIU were harassing and undermining him due to his race and his campaign for state representative.

Carey informed the PSEA of Koger's request for a grievance, but also informed them that Koger was not part of the bargaining unit and the PSEA had no authority to represent him. Accordingly, the PSEA did not file a grievance. Carey memorialized his reasoning in a letter to Koger dated April 1, 2008. Upon Carey's recommendation, the DCEA also chose not to file a grievance.

E.  Decision Not to Re-hire Koger

It was AIU's practice to meet with participating Smart START school districts at the close of the school year to discuss their desire to continue participating in Smart START and whether they wished to return particular Smart START substitutes. At this meeting, representatives of the School

12

District informed Colvill that they were dissatisfied with Koger's performance. Colvill removed Koger from the program at that time.

Between May and July, 2008, Koger contacted Addy and Colvill on several occasions to express his interest in various teaching and related positions for the summer and the next school year, and requesting information on the next year's Smart START program. On June 6, AIU sent Koger a letter, signed by Colvill, stating in part: "The Allegheny Intermediate Unit has decided at this time not to include you on our SmartSTART list for the 2008-2009 school year. We appreciate your efforts and the work you have done for the SmartSTART program this school year." It is not disputed that AIU had removed substitutes from the program in the past; in many, but not all cases, the letters would detail reasons for the adverse decision.

Koger received right to sue letters from the EEOC dated August 16 and November 29, 2010, against the PSEA and DCEA; dated September 13 and December 16, 2010, against AIU; and December 16, 2010, against the School District. No other right to sue letters are included in the record, but the individual defendants have not raised the defense of exhaustion of remedies.

13

F.   Daniel Carey E-Mail

Koger filed this lawsuit on November 2, 2010.   Shortly thereafter, Carey, in an email exchange with Stanley Whiteman, described Koger's case as follows:

> We're still dealing with the Todd Koger mess - they hired him as a Smart START sub, then basically used him as a long-term sub/Utility Teacher, which he clearly did not have the certification for.   The EEOC ruled that the District erred badly, on the record.   Now he's suing Duquesne, the AIU, and PSEA.

Koger, in his motion for summary judgment and each motion for sanctions, asserts that this constitutes an admission of liability and entitles him to judgment.


II.   STANDARD OF REVIEW

Fed. R. Civ. P. 56(a) provides that summary judgment may be granted if, drawing all inferences in favor of the non-moving party, "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law."

The mere existence of some factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. A dispute over those facts that might affect the outcome of the suit under the governing substantive law, i.e., the material facts, however, will preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S.

14

242, 248 (1986). Similarly, summary judgment is improper so long as the dispute over the material facts is genuine. Id. In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. Id. at 248-49.

To demonstrate entitlement to summary judgment, defendant, as the moving party, is not required to refute the essential elements of the plaintiff's cause of action. Defendant needs only point out the absence or insufficiency of plaintiff's evidence offered in support of those essential elements. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). Once that burden has been met, plaintiff must identify affirmative evidence of record that supports each essential element of his cause of action. If plaintiff fails to provide such evidence, then he is not entitled to a trial, and the defendants are entitled to summary judgment as a matter of law.

In summary, the inquiry under a Rule 56 motion is whether the evidence of record presents a genuine dispute over material facts so as to require submission of the matter to a jury for resolution of that factual dispute or whether the

15

evidence is so one-sided that the movant must prevail as a
matter of law.

III.    DISCUSSION

        A.    Lily Ledbetter Fair Pay Act

        The court will first address Koger's claim that
defendants violated the Lilly Ledbetter Fair Pay Act of 2009,
Pub. L. No. 111-2, 123 Stat. 5 (codified in 42 U.S.C.).

        The Lilly Ledbetter Fair Pay Act was passed in
response to the decision of the United States Supreme Court in
Ledbetter v. Goodyear Tire & Rubber Co., 550 U.S. 618 (2007).
It amended Title VII, among various other statutes, to provide
that every paycheck that stems from a discriminatory decision or
pay structure is an independent action that commences the
administrative statute of limitations.    42 U.S.C. § 2000e-
5(e)(3)(A); see Noel v. Boeing Co., 622 F.3d 266, 271 (3d Cir.
2010).    It applies exclusively to causes of action arising out
of the statutes which it amended; it does not provide an
independent cause of action.    See Wynes v. Kaiser Permanente
Hosps., No. 10-702-MCE-GGH, 2010 WL 3220137 at *7 (E.D. Ca. Aug.
13, 2010) (dismissing Fair Pay Act claim which did not arise
under an independent statute).    As such, the court will construe
plaintiff's claim as a claim of disparate treatment under Title
VII.

16

### B. Title VII, PHRA, and Section 1981

Claims under the PHRA are interpreted coextensively with claims under Title VII, and courts generally analyze them together. Atkinson v. LaFayette College, 460 F.3d 447, 454 n.6 (3d Cir. 2006). Section 1981 encompasses a broader range of conduct,[7] but in an employment discrimination case, the substantive elements of a section 1981 claim are nearly identical to the elements of a Title VII discrimination claim. Brown v. J. Kaz, Inc., 581 F.3d 175, 181-82 (3d Cir. 2009). See also Butt v. United Bhd. Of Carpenters & Joiners of Am., No. 09-4285, 2012 WL 360554 at *6 (E.D. Pa. Jan. 26, 2012) (as against a labor organization). Therefore, the court will consider claims under all three statutes together.

Under any of the three statutes, a plaintiff may pursue claims based on racial discrimination in employment decisions, a hostile workplace, or retaliation for enforcing his rights. See, e.g., Brown, 581 F.3d at 178.

---

[7] Section 1981 provides that all persons shall have the same right "to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property, as is enjoyed by white citizens . . . ." 42 U.S.C. § 1981(a). The phrase "make and enforce contracts" is broadly defined and has been interpreted to encompass at-will employment. McClease v. R.R. Donnelley & Sons Co., 226 F. Supp. 2d 695, 699 (E.D. Pa. 2002) (citing authorities).

17

## 1. Race Discrimination

### a. Employer Liability

#### i. Legal Standard

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ." 42 U.S.C. § 2000e-2(a)(1).

A plaintiff may survive summary judgment through the presentation of direct or indirect evidence. Pivirotto v. Innovative Sys., 191 F.3d 344, 352 n.4 (3d Cir. 1999). To prove discrimination by indirect evidence, the court must apply the burden-shifting framework established by McDonnell Douglas Corp. v. Green and its progeny. 411 U.S. 792 (1973); Keller v. Orix Credit Alliance, 130 F.3d 1101, 1108 (3d Cir. 1997). Under this framework, the plaintiff must first establish a prima facie case of discrimination by a preponderance of the evidence. Stewart v. Rutgers, 120 F.3d 426, 432 (3d Cir. 1997).

To establish a prima facie case of racial discrimination, the plaintiff must establish: (1) that he is the member of a protected class; (2) that he was qualified for the position he held or sought; (3) that he suffered an adverse employment action; and (4) that circumstances exist that give

18

rise to an inference of unlawful discrimination. Jones v. Sch.
Dist. Of Phila., 198 F.3d 403, 410-11 (3d Cir. 1999). "[T]he
prima facie test remains flexible and must be tailored to fit
the specific context in which it is applied." Sarullo v. United
States Postal Service, 352 F.3d 789, 797-98 (3d Cir. 2003).
Once a prima facie case has been set forth, the burden shifts to
defendant to articulate a legitimate, nondiscriminatory reason
for its action. Jones, 198 F.3d at 412.

        If the defendant can articulate such a reason, the
burden shifts back to the defendant to prove that the reason was
pretextual. Jones, 198 F.3d at 412-13. He can do so by
submitting evidence that either (1) casts doubt upon the reason
offered by the employer, such that a fact-finder could
reasonably conclude the reason was fabricated; or (2) would
allow the fact-finder to infer that discrimination was more
likely than not a motivating factor. Doe v. C.A.R.S. Protection
Plus, Inc., 527 F.3d 358, 370 (3d Cir. 2008).

                    ii.  School District Liability

        Koger has not presented any direct evidence that
discrimination was a motivating factor in the School District's
decision making.[8] Therefore, the court must determine whether he

---

[8]     Koger also alleges that he was told, upon assignment to
        Duquesne, that he was being sent to Duquesne because he was
        "black" and "they (the AIU) were hired by the Commonwealth
        to manage the all black school district." This is a

19

can demonstrate indirect evidence of discrimination, under the McDonnell Douglas framework, sufficient to reach a jury. First, Koger must establish a prima facie case that he was discriminated against.

Koger, an African-American, is clearly a member of a protected class. He alleges that he was the subject of three distinct adverse decisions: the decision not to allow him to return to his position for the 2008-2009 year; the decision to pay him at the day-to-day substitute's rate; and the decision not to hire him to other available positions, including those offered over the summer. See Wilkerson v. New Media Tech. Charter Sch. Inc., 522 F.3d 315, 320 (3d Cir. 2008) (holding that failure to rehire can be an adverse employment action); Watson v. Eastman Kodak Co., 235 F.3d 851, 857 (3d Cir. 2000) (analyzing discrimination in pay rate claim).

As described above, the Emergency Permit expired at the end of the summer following the school year. However, AIU could have applied for a subsequent Permit, and, construing the facts in favor of the plaintiff, the failure to do so constitutes an adverse employment action. Koger also applied for several other positions within the School District and was

---

troubling assertion, but cannot be linked to an adverse employment event. It is irrelevant to AIU's decision not to maintain his participation in the Smart START program.

20

not hired. This, too, constitutes an adverse decision. Finally, his pay rate, if lower than the rate for similarly situated teachers, is also an adverse employment action.

However, whether Koger was qualified for the other positions he sought within the School District or to be paid at a utility teacher rate depends on whether the School District properly classified him as a day-to-day substitute, as defined by the CBA. Thus the court must determine whether the evidence of record reflects a genuine dispute that Koger should have been considered a full-time utility teacher or long-term substitute instead.

Koger presents two arguments that he was a full-time teacher. First, he argues that Colvill hired him, orally, as a utility teacher. Second, he argues that, by working more than 60 consecutive days, he became a long-term substitute teacher pursuant to the CBA.

The only evidence in the record to support Koger's allegation that Colvill hired him as a utility teacher is his deposition testimony that "Mary Beth Colvill and Barbara McDonnell advised me that I was hired as a utility teacher and that if I worked three years I could receive a regular certification . . . ." However, this is not sufficient to establish that either had the authority to so hire him or that

21

he was permitted to hold a full-time teaching position under Pennsylvania law.

Indeed, all evidence on the record contradicts both notions. First, it is clear that Colvill did not have the authority to hire a teacher in any capacity to work for the School District. By statute, only the Board of Directors has the authority to hire teachers, whether on a permanent basis or as substitutes.[9] 24 P.S. § 11-1106. Although Colvill coordinated the Smart START program, and as such was responsible for Koger's recruitment and training, she was an employee of AIU, not of the School District. In reality, Koger was a product of Smart START, Colvill's program, but was hired for his teaching position by the Board of Control, not by Colvill or AIU.

Second, the record demonstrates that a full-time utility teacher must possess a valid Instructional Certificate. Defendants have submitted two Certification and Staffing Policy Guidelines issued by the PDE. The first, CSPG No. 1, unambiguously states: "Appropriate certification applies to all professional-level staff irrespective of . . . the employee's status as a temporary professional, professional, or

---

[9]     Duquesne had been classified as a school district during the 2007-2008 school year. As a result, it was governed by a Board of Control under the auspices of the PDE, rather than the Board of Directors contemplated by the statute.

22

substitute." CSPG No. 1, 2 (2004). CSPG No. 13 carves out an explicit exception for Type 04 and Type 06 Emergency Permits. CSPG No. 13, 1 (2010). The record reflects no other available exceptions. In addition, Koger submitted into evidence the approval of AIU's application for an Emergency Permit on his behalf. This approval, by its terms, allowed him to work only as a day-to-day substitute.

Nor could Koger have been approved for any other position, as he does not possess the credentials necessary to achieve an Instructional Certificate. He admitted in his deposition that he did not have a teaching degree, nor is there any evidence in the record that he sat for or passed any entrance examination. No reasonable fact-finder could infer from the record that Koger could have been hired as a full-time utility teacher, a position for which he was not qualified, on the basis of his bachelor's degree alone.

According to Koger, Colvill stated during the Smart START orientation that if a participant was to teach for three years as a Smart START substitute, he or she would receive a full teaching certification. The record is rife with information about the Smart START program, and as yet no one has produced evidence to suggest this could be the case. Nor is any such exception contemplated by Pennsylvania statute, regulation, or administrative guidance. He also claims that the School

District or AIU intentionally procured the wrong certification. AIU may have been remiss in obtaining a Type 06 Emergency Permit rather than a Type 04 Permit, but even correcting this mistake would not have allowed him to become a certified teacher as required for a full-time utility or substitute position.

Finally, other than the Emergency Permit approval, the only written documentation of Koger's employment on the record is the Hire Letter. That letter states unambiguously that Koger is a day-to-day substitute. Regardless of whether Koger received it, it provides proof of his status. No reasonable fact-finder could find that Koger's contradictory testimony creates a genuine dispute of fact.

Koger argues in the alternative that, by working 127.5 consecutive days, he became a full-time substitute teacher. The CBA provides that any day-to-day substitute who works more than 60 consecutive days in the same assignment will be "recognized" as a long-term substitute, and awarded the benefits and seniority attendant to the position. Plaintiff also relies heavily on the Daniel Carey email in which Carey states "they hired him as a Smart Start sub, then basically used him as a long-term sub/Utility Teacher, which he clearly did not have the certification for."

However, the record demonstrates that Koger did not, in fact, work in the same assignment for 60 consecutive days.

24

Instead, he spent the spring semester moving between Mr. Sandy's science class and Mr. Balta's reading class. Although both teachers had sporadic attendance records, neither was ever absent for a period exceeding 60 consecutive days. From his deposition, it is clear that Koger believes that his tenure as a purported utility teacher constituted a single assignment. However, the CBA's provisions regarding substitutes should be read in harmony with the PDE interpretations regarding the same. According to the PDE, a utility teacher position would not constitute an assignment, because an assignment requires time spent substituting for the same teacher in the same subject area. Because Koger did not spend 60 consecutive days substituting for the same person in the same subject area, he could not have been recognized as a full-time substitute under the CBA.[10]

In addition, as discussed at length above, Koger was not hired as a utility teacher to begin with, and Carey's email does not tend to make it substantially more likely that he was. Even construed as an admission of fact, a statement that Koger was "basically" employed improperly does not meet the very specific standard negotiated into the CBA - that the day-to-day substitute spend 60 consecutive days or more in a single

---

[10] The court also notes that, just as with full-time utility teachers, a long-term substitute must have a valid Instructional Certificate. Koger, of course, does not.

25

assignment. Koger did not meet that standard, and an email inviting a different interpretation is not sufficient to overcome the overwhelming weight of evidence in the record.

In sum, Koger has not presented the evidence necessary to raise an issue of material fact as to whether he was anything other than a day-to-day substitute. Therefore, he was not qualified for any position he applied for during the summer or for the following school year which required a Pennsylvania Instructional Certificate. Nor was he entitled to pay at the utility teacher rate. He was properly paid $75.00 per day.

Therefore, Koger was only qualified to continue to participate in the Smart START program pursuant to an Emergency Permit. Nevertheless, even this does not allow him to establish a prima facie case, because the failure to renew his Emergency Permit does not give rise to an inference of discrimination. He has presented three full-time utility teachers as comparators in an attempt to raise such an inference: Jennifer Kovar, Nannette Nowak, and Eric Robertson. Each is white, and each was paid the full-time utility teacher salary of $33,911. However, none is similarly situated. Each held full-time utility teacher or long-term substitute teacher positions. Defendants have produced the Instructional Certificates for each, so there is no dispute that each was properly certified for his or her

26

position. Their retention does not reflect on Koger's dismissal in a way that would demonstrate he was discriminated against.

Finally, even if he were to establish a prima facie case of discrimination, the School District has articulated legitimate, nondiscriminatory reasons which Koger cannot show are pretextual. The undisputed facts on record demonstrate that Koger's performance of his current job did not meet the expectations of the School District and its officials. Koger has disputed whether he was "habitually" tardy, but this was not the School District's only complaint. According to the principal at the time, Barbara McDonnell, he allowed students to eat in the classroom in violation of school rules, did not follow a prepared syllabus, screened movies without permission, and allowed students from other classes to visit and remain in his classroom while school was in session.

To dispute that his job performance was deficient, and therefore that the School District's articulated reasons were pretextual, Koger relies primarily on two arguments. First is that the letter informing him that he was not welcome back did not state the grounds for his dismissal. Because other letters sent to substitutes who were not rehired were more detailed, he infers that his performance must have been satisfactory. Second, he claims, without evidentiary basis, that the "cupcake incident" was staged. Neither of these arguments contradict the

27

evidence in the record that he was not performing his job adequately. Therefore, neither of Koger's arguments would be sufficient to cast doubt on the School District's legitimate, non-discriminatory reasons, such that a fact-finder could reasonably conclude they were fabricated.

Nor has Koger presented any evidence which would prove that discrimination was more likely than not a motivating factor in his dismissal. In several of his pleadings and motions, Koger has alleged other incidents which could be construed as suggestive of pretext, including that the Duquesne City School Police Chief told him that "Barbara McDonnell was out to get him[.]" However, the record does not contain any evidence, admissible or otherwise, regarding this or other incidents. Most critically, the record is devoid of any evidence that Koger's race played a role in the decision to exclude him from Smart START. He cannot make out a claim for racial discrimination against the School District.

b. Employment Agency Liability

i. Legal Standard

Koger seeks to hold AIU responsible for Title VII violations as an employment agency.[11] Under Title VII, an

---

[11] AIU spends considerable time in its brief arguing that it was not Koger's employer. However, Koger consistently refers to AIU as an employment agency, and, at any rate, the agency relationship more closely fits the facts.

28

employment agency may not "fail or refuse to refer for employment, or otherwise to discriminate against, any individual because of his race [or] color . . . or to classify or refer for employment any individual on the basis of his race [or] color . . . ." 42 U.S.C. § 2000e-2(b).

An employment agency is defined in Title VII as "any person regularly undertaking with or without compensation to procure employees for an employer or to procure for employees opportunities to work for an employer and includes an agent of such person." 42 U.S.C. § 2000e(c). The definition clearly covers more than businesses who hold themselves out as "Employment Agenc[ies]." Scaglione v. Chappaqua Central Sch. Dist., 209 F. Supp. 2d 311, 319 (S.D.N.Y. 2002). In Scaglione, a civil service administrator was found to be an "employment agency" under Title VII where it provided several school districts with employee lists from which the school districts could hire new employees at their own discretion. Id. at 315-19. This is similar to the role played by AIU. See also Kemether v. Penn. Interscholastic Ath. Ass'n, 15 F. Supp. 2d 740, 764-65 (E.D. Pa. 1998) (finding that assignors who match referees to PIAA member schools may qualify as employment agencies).

Although there are few cases dealing with discrimination by employment agencies, the traditional burden-

29

shifting framework is applied in much the same way as against an employer. See EEOC v. Kelly Servs., 598 F.3d 1022, 1030 (8th Cir. 2010) (applying test to religious discrimination under Title VII); Hudson v. Kelly Servs., Inc., No. 4:05CV1096, 2006 WL 2320684 (E.D. Mo. Aug. 8, 2006) (racial discrimination). However, the scope of prohibited practices is limited; courts have held that section 2000e-2(b) does "not encompass the practices prohibited to 'employers.'" Kellam v. Snelling Personnel Servs., 866 F. Supp. 812, 817 (D. Del. 1994). Instead, they can be held liable only for discrimination in referrals, failure to refer, or other discriminatory practices relating to referral. Id.

## ii. AIU Liability

Via the Smart START program, AIU would conduct orientation and training of applicants for substitute teaching positions. The participants would then select the school districts in which they desired to work. At that point, AIU would obtain an Emergency Permit that would enable the individual to teach, and forward the permit and file to the chosen school district. The school district would then contact the teacher as needed, and assume responsibility for payment and supervision. Based on these facts, AIU was at this time regularly procuring employees for the school districts under its purview, and at the same time providing Smart START participants

30

with opportunities to teach in the school districts. Therefore, AIU may fairly be construed as an employment agency for purposes of 42 U.S.C. § 2000e.

Because AIU is not responsible for the acts of the employer, Koger may hold it liable only for its decisions not to renew his Emergency Permit and to prevent him from participating in Smart START for the 2008-2009 school year. However, Koger cannot demonstrate a prima facie case of discrimination against AIU for reasons similar to those pertaining to the School District. As Colvill attested in her affidavit, he was removed from the Smart START program due to the negative feedback they received from the School District both during and after the school year. She stated that it is the consistent practice of AIU to "discontinue using any substitutes who are not performing their duties as expected." Additionally, AIU submitted several termination letters as circumstantial evidence that underperforming substitutes are not asked back to the program.

As discussed above, Koger has not contradicted the evidence presented by the School District and AIU that he was not performing his job as a day-to-day substitute adequately. With respect to AIU, he has also not presented evidence of any comparators or other circumstances that would give rise to an inference of discrimination.

31

He does argue that AIU and the School District intentionally pursued the wrong certification on his behalf, preventing him from being able to teach full-time. However, the undisputed facts demonstrate that neither AIU nor the School District possessed the power to obtain an Instructional Certificate on his behalf. The prerequisites to obtaining an Instructional Certificate can be obtained only by the applicant himself.

Moreover, even if he were able to meet his prima facie case, he has not presented evidence sufficient to rebut AIU's legitimate, nondiscriminatory reason for removing him from Smart START, specifically that one of the school districts under its purview had found his performance deficient.

### c. Union Liability

#### i. Legal Standard

Labor organizations such as the DCEA and PSEA are also subject to liability for discriminatory acts. Among other things, Title VII makes it unlawful for a labor organization "to limit, segregate, or classify its membership or applicants for membership, or to classify or fail or refuse to refer for employment any individual, in any way which would deprive or tend to deprive any individual of employment opportunities, or would limit such employment opportunities or otherwise adversely affect his status as an employee or as an applicant for

32

employment, because of such individual's race [or] color
. . . ." 42 U.S.C. § 2000e-2(c)(2).

Such a violation is analyzed under the McDonnell Douglas framework described above. Hubbell v. World Kitchen, LLC, 688 F. Supp. 2d 401, 430 (W.D. Pa. 2010). In such a case, plaintiff may establish a prima facie case by proving that: (1) the employer violated the CBA in a manner that adversely affected him; (2) the union violated its "duty of fair representation"; and (3) the unions' actions or inactions occurred under circumstances giving rise to an inference of discrimination. Id. at 430. The duty of fair representation is the "statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." Vaca v. Sipes, 386 U.S. 171, 177 (1967). It can be violated if the union decides not to pursue a grievance for discriminatory reasons. 14 Penn Plaza LLC v. Pyett, 556 U.S. 247, 271 (2009). In particular, a union may not fail to process a grievance brought by members of a protected class to avoid alienating an employer. Goodman v. Lukens Steel Co., 482 U.S. 656, 669 (1987), superseded on other grounds by statute, 28 U.S.C. § 1658(a).

33

## ii. Analysis

Whether the DCEA and PSEA (together, the "Union Defendants") acted in a discriminatory manner depends on whether Koger was a member of the bargaining unit such that his relationship with the School District would be subject to the CBA. Thus, the court must determine whether there is a genuine dispute about Koger's membership in the bargaining unit.

The CBA explicitly grants long-term substitutes, but not day-to-day substitutes, rights as members of the bargaining unit. This is true even though the position of day-to-day substitute is contemplated by the CBA, recognized by both the School District and DCEA, and defined in the same subarticle as long-term substitutes, entitled "Substitutes." This is a textbook application of the rule of construction that the inclusion of one thing implies the exclusion of another. See, e.g., Dugan v. Coastal Indus., Inc., 96 F. Supp. 2d 481, 484 (E.D. Pa. 2000) (finding application of rule of contract construction appropriate). The intent of the parties is clear that, through the inclusion of long-term substitutes in the bargaining unit, they intended to exclude day-to-day substitutes. As Koger was merely a day-to-day substitute, he was not a member of the bargaining unit and not entitled to the rights of a bargaining unit member.

34

Therefore, Koger's prima facie case clearly fails. The CBA protects only members of the bargaining unit, and the School District's conduct, even were it blameworthy, would not have constituted a violation of the CBA. Second, and perhaps most importantly, the Union did not owe him a duty of fair representation. Peterson v. Lehigh Valley Dist. Council, United Bhd. of Carpenters & Joiners, 676 F.2d 81, 87 (3d Cir. 1982) (noting that "plaintiffs must show that they belong to the bargaining unit in order to benefit from the union's duty" of fair representation). Third, no inference of discrimination arises from the record. Koger has not provided any evidence to suggest that the Union had represented other day-to-day substitutes in the past. Koger cannot make out a prima facie case against the Union Defendants.

### d. Individual Defendants

#### i. Legal Standard

In no case can individuals be held liable under Title VII. Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1078 (3d Cir. 1996). However, supervisory employees may be liable under the PHRA if they "aid, abet, incite, compel or coerce the doing of any act" prohibited by the statute. 43 Pa. Cons. Stat. § 955(e); Dici v. Pennsylvania, 91 F.3d 542, 552 (3d Cir. 1996). They may be held liable in this fashion, for example, by failing to take prompt remedial action against

35

discrimination. Dici, 91 F.3d at 552-53. For an individual to be liable under section 1981, he or she must "intentionally cause an infringement of rights protected by Section 1981, regardless of whether the [employer] may also be held liable." Cardenas v. Massey, 269 F.3d 251, 268 (3d Cir. 2001) (quoting Al-Khazraji v. Saint Francis College, 784 F.2d 505, 518 (3d Cir. 1986)), abrogated in part by Jensen v. Potter, 435 F.3d 444 (3d Cir. 2006).

### ii. Analysis

Since the School District did not violate the PHRA, the individual defendants cannot be held liable for aiding and abetting any such discriminatory practices. See Dici, 91 F.3d at 552-53. Nor has Koger established any direct acts of discrimination by any of the individuals in question.

Koger also cannot make out a claim against the individual defendants pursuant to section 1981 for the same reasons the claim fails against the School District, AIU, and the Union Defendants, respectively. He has not established a prima facie case that defendants interfered with his at-will employment on the basis of his race.

### 2. Hostile Work Environment

#### a. Legal Standard

Koger also claims he was subjected to a hostile work environment. Under Title VII, a plaintiff can establish a claim

36

based on a racially hostile work environment if he can show that: (1) he suffered intentional discrimination on account of his race; (2) it was pervasive and regular; (3) it detrimentally affected him; (4) it would have detrimentally affected a reasonable person in his position; and (5) there is a basis for vicarious liability against the employer. Caver v. City of Trenton, 420 F.3d 243, 262 (3d Cir. 2005). The "conduct must be extreme to amount to a change in the terms and conditions of employment." Caver, 420 F.3d at 262 (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998)). The court does not understand Koger to extend his allegations of a hostile work environment or retaliation to the Union Defendants.

### b. Analysis

Koger claims that he was subjected to a hostile work environment. Underlying this claim are his allegations about the "cupcake incident," that the administration changed his students' grades arbitrarily, that McDonnell on several occasions failed to sign his time sheets, that he was defamed, and that he was denied further employment. In addition, he has produced two identical affidavits in which students state that McDonnell, Whiteman, and other teachers suggested or implied that Koger was suspected of, and even arrested for, inappropriate touching of a female student. The student affiants deny that any such touching occurred.

37

These incidents have varying levels of evidentiary support in the record. However, there is no evidence to show, or even suggest, that the hostile work environment was traceable in any way to Koger's race. There is no Title VII claim unless Koger is able to establish some connection to his status as a member of a protected class; he cannot do so, and this failure is fatal to his Title VII claim.

### 3. Retaliation

#### a. Legal Standard

Koger has also raised a claim for retaliation. To demonstrate a claim for retaliation, he must demonstrate that (1) he was engaged in conduct protected by Title VII; (2) he suffered an adverse employment action; and (3) a causal nexus exists between the protected conduct and the adverse action. Wilkerson, 522 F.3d at 320. The employee must possess an "objectively reasonable" belief that, through his protected conduct, he is opposing unlawful discrimination. Id. at 322. "To put it differently, if no reasonable person could have believed that the underlying incident complained about constituted unlawful discrimination, then the complaint is not protected." Id. See also Curay-Cramer v. Ursuline Acad. Of Wilmington, Del., Inc., 450 F.3d 130, 135 (3d Cir. 2006) (noting that a complaint must allege "that a protected characteristic

was the basis for the adverse employment action" to constitute
protected conduct).

### b. Analysis

At the center of Koger's retaliation claim is that he
was not brought back, at least in part, due to "his continuous
complaints to officials who had final discretion to make
decision or take action." In his deposition he testified that
he had reported teachers for what he considered inappropriate
interactions with students. He also claims he complained about
his own allegations of racial discrimination and the school's
lack of a discrimination policy. All complaints, he claimed,
were made to Addy, AIU's Director of Human Resources. In a
sworn affidavit, Addy states that he found the discrimination
claims "to be without merit."

Koger's complaints about the conduct of other teachers
is not connected to a protected characteristic under Title VII,
so cannot form the basis for a claim of retaliation. His
complaints about racial discrimination were not objectively
reasonable. They turn nearly entirely on disparate treatment as
compared to utility teachers and full-time substitutes. The
undisputed facts on record demonstrate that the actual basis for
the difference in treatment was that those teachers were
certified to teach in Pennsylvania and Koger was not. That
Koger was mistaken or confused about the certification

39

requirements does not make his complaints objectively reasonable.

Therefore, Koger's retaliation claim cannot survive summary judgment.

C. Section 1983

1. Legal Standard

Section 1983 is designed to protect rights established by the United States Constitution and federal law. 42 U.S.C. § 1983. "[T]he statute creates no substantive rights; it merely provides remedies for deprivations of rights established elsewhere." City of Oklahoma City v. Tuttle, 471 U.S. 808, 816 (1985). A plaintiff must prove that the defendants, acting under color of state law, deprived him of a right secured by the Constitution or federal law. Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 907 (3d Cir. 1997).

The requirement that a defendant "act under color of state law" means that merely private conduct, no matter how discriminatory or wrongful, does not violate section 1983. Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 50 (1999). To prove a defendant acted under the color of state law, the plaintiff must establish such a close nexus between the state and the challenged action that the private behavior in question may be "fairly treated as that of the State itself." Leshko v.

40

Servis, 423 F.3d 337, 339 (3d Cir. 2005) (internal quotation omitted).

## 2. Analysis

Section 1983 safeguards only rights established by other federal law or under the Constitution. Here, all of Koger's claims under federal law - pursuant to Title VII and section 1981 - are resolved in favor of the School District. Correspondingly, his claims under section 1983 necessarily fail as well.[12]

## D. Common Law Duty of Loyalty to an Agent

### 1. Legal Standard

Koger also asserts that AIU, the School District, DCEA, and PSEA were his agents, and that each violated the duty of loyalty owed by an agent to a principal. An agent must act with the utmost good faith in furthering and advancing the principal's interests. Basile v. H&R Block, Inc., 761 A.2d 1115, 1120 (Pa. 2000). The burden of establishing an agency relationship is borne by the party asserting the relationship. Id. Agency is established by "the manifestation by the principal that the agent shall act for him, the agent's

---

[12] At any rate, the Union, Carey, and Whiteman could not be held liable under section 1983 even if federal claims survived. Public employee unions do not generally operate under color of state law. Jackson v. Temple Univ. of Commw. Sys. of Higher Educ., 721 F.2d 931, 933 (3d Cir. 1983).

41

acceptance of the undertaking and the understanding of the parties that the principal is to be in control of the undertaking." Id. (internal quotation omitted).

## 2. Analysis

Koger's claim against the School District and AIU for breach of the common law duty of loyalty fails, as he was the agent of the School District, not the other way around. The School District owed him no duty of loyalty. There was no principal/agent relationship between Koger and AIU.

This court is unaware of any Pennsylvania case law applying the duty of loyalty to the relationship between a union and union member. Construing Koger's pleadings liberally, he appears to have actually alleged a breach of the duty of fair representation, independent of Title VII. The claim fails for the same reason that his Title VII claim against the Union Defendants fails. Koger is not a member of the bargaining unit and the Union Defendants owe him no such duty.

## E. Remaining Motions

Koger has moved, twice, for discovery sanctions, moved to strike the declarations of undisclosed witnesses, and moved in limine to exclude certain evidence. He argues, inter alia, that defendants violated Fed. Rule Civ. P. 26 by not specifically disclosing witnesses and evidence on which they

42

relied in their motions for summary judgment. These motions are each without merit and will be denied.

Because this case will be resolved in their favor, defendants' motions to strike Koger's sur-reply as unauthorized and untimely will be denied as moot.

IV. CONCLUSION

For the foregoing reasons, defendants' motions for summary judgment will be granted and Koger's motion for summary judgment will be denied. The remaining pending motions will be denied.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

TODD ELLIOTT KOGER              )
                                )
             Plaintiff,         )        Civil Action No. 10-1466
                                )
        v.                      )
                                )
                                )
ALLEGHENY INTERMEDIATE          )
UNIT, <u>et al</u>             )
                                )
             Defendants.        )

ORDER

AND NOW, this 24ᵗʰ day of February, 2012, IT IS HEREBY
ORDERED that Defendants' Motions for Summary Judgment [Doc. Nos.
76 and 80] are GRANTED.  Plaintiff's Motion for Summary Judgment
[Doc. No. 70] is DENIED.  All other pending motions are denied
as moot.

        The Clerk of Courts is directed to mark this case
CLOSED.

                              BY THE COURT,

                              _____ C.J.
                              Hon. Gary L. Lancaster,
                              Chief United States District Judge

cc:  All Counsel of Record

     Todd Elliott Koger
     515 Kelly Avenue
     Pittsburgh, PA 15221